## CENTRAL OF GEORGIA RAILWAY CO. *v.* MOTES.

1. Whether a regulation adopted and sought to be enforced by a carrier of passengers is or is not reasonable is a question of law, and not one of fact for determination by a jury.
2. In the absence of any duty devolving upon a railway company to provide at its stations a place wherein its patrons may sleep while awaiting the arrival or departure of trains, a regulation forbidding passengers from going to sleep in its waiting-rooms or lying down on the benches therein is not, in a legal sense unreasonable.
3. A passenger who displays a persistent determination to disregard such a regulation, and by his wrongful conduct so exasperates a servant of the company as to unfit him for properly performing the duty he owes his master with respect to his treatment of its patrons, can not justly complain that the com-

pany's servant lost his temper and resorted to unnecessary force in compelling an observance of the regulation on the part of the passenger.

Argued March 17, — Decided April 8, 1903.

Action for damages. Before Judge Nottingham. City court of Macon. April 19, 1902.

*Hall & Wimberly, J. E. Hall*, and *R. D. Feagin*, for plaintiff in error. *H. A. Mathews* and *Guerry & Hall*, contra.

SIMMONS, C. J. An action sounding in tort was brought by Isaac Motes against the Central of Georgia Railway Company, to recover damages for an assault alleged to have been committed upon him by an employee of the company. On the trial of the case the plaintiff was introduced as a witness in his own behalf, and testified substantially as follows: About the 5th of January, 1901, he purchased at Griffin a ticket entitling him to be carried over the line of the defendant's road from that point to Fort Valley. He took passage upon an afternoon train which ran as far as Macon, an intervening station, and arrived there about seven o'clock. He was asleep when the train "rolled into the depot, and . . was not aroused until all the passengers were off," when "the conductor, or porter, or some official, came through and waked" him up. He then got off on the left-hand side of that train, and inquired of a man wearing the uniform of a porter what train he should take in order to reach his destination. Being directed to a train on the right-hand side of that he had left, he boarded the former; but after it had proceeded some distance from the depot, he learned that it was not "the right train to Fort Valley," and thereupon "got off the train and walked back." On his return to the station he made inquiry at the ticket-office concerning the train he should have taken, and was informed it had left, and he would be compelled to wait for the next train passing through Fort Valley, which would not leave Macon until early in the morning of the following day. He then "proceeded to the waiting-room;" and as he "was tired and sleepy from the fatigue of the day, . . laid down across the benches and went to sleep." Shortly afterwards, the official in charge of the waiting-room came and waked the plaintiff, telling him "that was not a hotel; that the benches were made to sit on." As soon as this official went out of the room, the plaintiff "laid back down in a reclining position," not "in the same position" he

had before assumed, but in one which admitted of his resting upon his elbow and allowing his feet to hang off the seat. "It was not but a short while before the" official just mentioned came back into the room, pulled the plaintiff up, and told him he would send him to a hotel; that "he could not sleep there." In reply, the plaintiff said he "did not care to go to a hotel." This official again left; where upon the plaintiff "slipped back on the seat, where [he] could lay [his] head on the back of the seat." He "did not lay down that time," but put his "head on the back of the seat" and closed his eyes. "In a few minutes [he] was disturbed again by the same" official, who "pulled [him] out of [his] seat and jerked [him] around a little." Plaintiff had his coat buttoned up. The official pulled it open, "jerking off some buttons," and threatened to carry plaintiff to the "court-house" and lock him up. After shaking him, and while still having hold of him, the official demanded that the plaintiff show his ticket, and compelled him to exhibit it before he was turned loose. The official "did not make any apology for his conduct," when shown plaintiff's ticket, but remarked that he "didn't have any business there any way," as he "should have gone on the train" which he had missed. Plaintiff was not further molested in any way, and left Macon on the morning train for Fort Valley. His coat was not injured, save that the top button was torn off. "The other buttons came unfastened," as the company's official took hold of the plaintiff's coat where it came together at the collar. He "was not drinking that night," but was merely drowsy and sleepy. He was pulled up out of his seat the last time he was disturbed; "was not to say sound asleep at the time, [but] was in a dozing manner." Was pulled to his feet, though not carried off further than a few feet. The benches in the waiting room were placed back to back, and were provided with small arms, so arranged as to divide the benches into seats. "The sitting-down places were entirely separated from each other all the way across," and the seats were "large enough for a person to sit on."

During the course of the plaintiff's examination while on the witness stand, he stated that he did not remember having made any remarks to the official in charge when the latter first aroused him from his slumbers and told him he could not sleep in that room, as it was not a hotel, and the benches were made to sit on; though,

the witness said, he "might have made some remark." He admitted he paid no regard to what this official said as to how he should conduct himself, and immediately lay "down in a reclining position to rest, after he went out, [and] as a matter of fact" did again go to sleep.    Upon being again awakened and told he would be sent to a hotel, he replied he "didn't care to go to a hotel; that [he] would spend the night there."    The railroad official doubtless understood him to mean by this remark that he did not intend to observe any regulation of the company with respect to the right of passengers to regard its waiting-room as a lodging-house; for it affirmatively appears from the testimony of another witness, whom the plaintiff himself introduced, that in point of fact he did make an offensive reply to the company's official when first approached by him and told he must not sleep in the waiting-room.    In this connection, this witness testified: "I just noticed the officer shake the young man awake and tell him that he must not sleep in the waiting-room; that if he wanted to sleep, he had better go to the hotel.    The young man replied that he would sleep if he felt like it."    According to the account given by this witness, "the officer went out of the room and returned in . . about twenty or thirty minutes, and walked to where the young man was sitting, and jerked him out of his seat and tore the buttons from his coat," taking hold of him rudely and using him "pretty rough."    The witness further undertook to assert that the plaintiff had not lain down on the benches at any time previously, and was sitting quietly in his seat asleep when thus rudely aroused—"leaning on his hand, sitting in the seat."    Witness "saw the officer approach the young man twice" only.    The second time, "the officer jerked the young man from his seat to the floor, or to his feet, and said that he had told him not to sleep in there, and that he would see he did not do so."    Witness was himself "asleep part of the time that night in the waiting-room and was not disturbed by the officer at all;" but neither he nor any one else present was, he said, "stretched on the benches asleep," and the "young man never laid down."    Not only as to this last statement, but in other respects, the testimony of this witness differed essentially from what the plaintiff admitted was the truth with regard to what actually occurred.

The only other witness who testified on the trial was the company's official who had charge of its waiting-rooms on the occasion

under investigation. He explained that there were "three waiting-rooms at the depot: a colored waiting-room, a general waiting-room, and a private waiting-room for ladies," which was a small room opening into the general waiting-room. Ladies usually sat in this small room when unaccompanied by gentlemen, though the general waiting-room was provided for the accommodation of both sexes. While there were "no printed regulations for the government of the waiting-rooms at the Union Depot," there were verbal ones with regard to lying down on the benches, and as to sleeping in the general waiting-room; and the witness had been a number of times instructed not to permit a violation of these regulations. It was his duty to preserve order in and about the depot, and his "jurisdiction embraced the waiting-room" set apart for ladies and gentlemen, to which the plaintiff went. He was first seen by the witness somewhere between 8 and 9 o'clock, and was then in this waiting-room, sitting by the stove, with several others. "The next time [witness] went in there, he was lying down on the seat. He had moved down to the end of the seat then, and had his head on" one of the arms, and was "stretched out full length on the bench." Witness "went to him and tried to get him to get up then, and told him to sit up, but he didn't do it. He just let his foot down off the seat and lay there." A train was backing into the car-shed at the time, and witness had to leave to attend to other duties. When he returned to the waiting-room, plaintiff was still lying there, and witness "asked him again to get up and sit up," saying "that was not any place to sleep; that if he wanted to sleep, he must go and get a room." Plaintiff said he would, if witness would pay for it; but this the latter declined to do, and "insisted on his getting up and sitting up, and he would not do it. He would not make any move to do it, and [witness] caught hold of his coat right there, in order to pull him in a sitting position, not to pull him off the seat. A button broke off. He got up then and picked the button off the floor and stood up in the floor, and then was the time [witness] asked for his ticket, and he said he had it." Witness asked to see it, but plaintiff replied he "never had any business to see it until train time," and that "when he [plaintiff] started through the gate, he would let" witness see it. Witness told him he would have to show his ticket or get out; "that he would not stay there unless he did let [witness] see it. He finally offered it,"

though he held on to one end of it, and witness "saw enough to see where it was to and from." Nothing further was said, save that witness "told him he had no business there; that his train was gone, and if he came from Griffin he ought to have gone on the Albany train right on to Fort Valley." Witness approached the plaintiff only twice. "He was lying full length on the bench both times. . . . He was lying with his body over the arm the second time, with his head on the arm of the seat, and he was occupying two seats then." Witness asked for his ticket in order to ascertain whether or not he was a passenger; whether "he was going anywhere or not," and whether "he had any right to the building or not. Passengers are not allowed to lie across benches; it does not matter how many tickets they have." Witness "did not see any one else in the waiting-room lying across the benches asleep. There were cards hung on the back of each train in that shed at that time for the guidance of the people, showing what train it was, and where it went to. That was true in every instance at that time." Plaintiff "explained how he got left."

1. The trial judge refused to give in charge to the jury the following written request: "If you believe from the evidence that the plaintiff, Isaac Motes, after being informed by the officer of the defendant company who was in charge of the white waiting-room that he could not sleep across the benches in such waiting-room, or could not lie across said benches for any purpose; and if you believe from the evidence that Motes persisted in lying across said benches, after having been informed by the officer in charge that he had no right to do so, then I charge you that the officer in charge had the right to use such force towards Motes as was necessary to enforce the regulation." As will be noted, this request to charge was based upon the assumption that, as matter of law, the regulations adopted by the company with respect to lying across benches and sleeping in its waiting-room were reasonable. His honor did instruct the jury in general terms that the "defendant's agent was authorized in law to use such force as was necessary in enforcing reasonable regulations of the company," and further told the jury that it was for them to determine whether or not, in point of fact, the particular regulations adopted by the defendant company were, under all the circumstances, reasonable and proper. Apparently the jury found they were not. The question is therefore presented

whether it was or was not within the province of the jury to de-
termine this all-important matter.	We think not.	"A railroad
company has an implied authority (which is necessarily almost ab-
solute) to make and enforce all reasonable rules and regulations for
the control of its trains and the persons thereon, of persons using
its stations and grounds, and of those transacting business with it,
in order to provide for the safety of its passengers and employés,
and to protect itself from imposition and wrong."	1 Elliott on
Railroads, § 199.	" To this end," carriers of passengers " may reg-
ulate the purchase of tickets, the time and manner of procuring
and paying for the same, and the time and manner of surrender-
ing them; the manner and time of entering and leaving the cars;
and the conduct of the passengers while upon the cars or at stations
waiting for trains, as that they shall not be boisterous or disor-
derly. . . Rules and regulations in regard to separate cars for la-
dies and their escorts" have been upheld as reasonable, as have also
rules " prohibiting disorderly conduct on the cars."	And it is the
right of common carriers to " exclude from their carriages and prem-
ises such persons as refuse to comply with their reasonable reg-
ulations."	Ibid. § 200.	"The reasonableness of such regulations
and the manner of their enforcement in a given case has been held
by some of the courts to be a question of fact for the jury.	But
it would seem that this must be a question of law for the court to
decide, if any fixed and permanent regulations are to be established,
and the better authority holds it to be such; since one jury in a
given case might pronounce the rule reasonable, while another jury
in another case might decide the same rule to be unreasonable.
. . There are, doubtless, many cases in which the reasonable-
ness of the rule depends, in the particular instance, upon dis-
puted facts or circumstances, and, where this is true, it may, per-
haps, be called a mixed question of law and fact; but, when the
facts are undisputed, we think it is clear, both upon principle and
according to the weight of authority, that the question is one of
law for the court."	Ibid. § 202.	Says no less an authority than
Judge Thompson:	"Whether a certain rule of a railway corpora-
tion be *reasonable* and therefore valid is a question of law for the
court, — the general rule being that the reasonableness of the by-
laws, rules and regulations of corporations, whether private or mu-
nicipal, is to be decided as a question of law, and that such a by-law,

rule or regulation, if unreasonable, is to be held void as matter of law; and it is improper to submit the question of the reasonableness of such a by-law, ordinance, or regulation to the decision of a jury." 1 Thomp. Trials, § 1057. The subject came under discussion in the case of *Southern Ry. Co.* v. *Watson*, 110 *Ga.* 682, 690,. wherein the question arose as to whether or not a carrier of passengers could lawfully undertake to limit the time in which a railroad ticket should be used. In this connection, Mr. Justice Little, who delivered the opinion of the court, said: "All the authorities which support the doctrine that a railroad company may by rules and regulations limit the time in which a ticket can be used for passage concur in the view that such regulations must be reasonable, and whether or not a regulation of this character is or is not reasonable is a question to be determined by the court. On this subject, the rule as we understand it is, that where the facts. are not disputed the reasonableness of a regulation of a common carrier affecting the transportation of passengers is one of law for the court, and not of fact for the jury." See also the cases cited on page 690.

2. We shall not at this time undertake to do more than determine whether or not, as regards a waiting-room in a city such as Macon, where weary travelers may, if they wish, procure suitable accommodations for rest and comfort, regulations forbidding the use by passengers of benches as beds, or any other attempted transformation of a railroad waiting-room into a lodging-house, tend to deprive passengers of inalienable rights, or are for any other reason to be regarded as despotic and unreasonable. It is pertinent here to remark that there was no evidence introduced on the trial touching any rule promulgated by the railroad commission of this State with respect to the duty of a common carrier to furnish lodgings to such of its patrons as find it convenient to present themselves at the carrier's depot during the night, there to remain until the scheduled departure of a morning train several hours later. Nor have we been cited to any common-law or statutory rule which imposes upon a railway company any such duty towards such patrons, or to one holding a ticket, who, through his own fault or misfortune, has missed an evening train. Accordingly, we shall endeavor to decide on principle whether such a duty does or does not, as a general thing, exist. It seems reasonable to assert that a

railway company could not be considered unreasonable if it adopted a regulation whereby a passenger was not admitted to its waiting-room until an hour or so before the departure, on schedule time, of a train the passenger desired to take.    Nor would it appear more unreasonable for the carrier to actually keep its waiting-room open all night for the accommodation of its patrons, permitting them to enter it at any time they chose, on condition that they would not abuse the privilege thus accorded them, by undertaking to wrest from the carrier a night's sleep to which they were not entitled. Many good reasons might be suggested why the carrier would be unwilling to extend an unqualified invitation to enter at will and stay as long as desirable.    For instance, passengers expecting to take a particular train might, if permitted to indulge in inopportune sleep, miss the train and be left complaining on the carrier's hands, instead of making a timely and orderly departure and giving place to other passengers entitled to enter its waiting-room and partake of the accommodations it afforded.    Again, the carrier could have a laudable ambition to so conduct its waiting-room that passengers of culture and refinement might be spared the disgust of witnessing the uncouth and unseemly behavior of a different class of travelers, whose sense of decency fails to suggest to them the impropriety of sprawling over or upon benches or seats designed for a purpose other than that of affording an opportunity to retire for the night in a grotesque, if not offensive, attitude of repose.    The reasonableness of a regulation adopted by a carrier of passengers with respect to the use to be made of its premises is not to be arbitrarily determined by applying the test whether or not such regulation would be reasonable if adopted by a carrier of live stock.    The circumstances of time and place are to be given due consideration.    On the western frontier, years ago, the reasonableness of attempting to regulate the "shooting out" of station lights by waiting passengers might have been seriously questioned by at least some members of the traveling public.    To-day there is doubtless a growing sentiment in all parts of the country against converting into a smoking apartment a general waiting-room provided for the accommodation of both sexes, as well as against treating with contempt the invitation held out by the station-house "sand-box" or cuspidor, and other minor infractions of the laws of etiquette which obtain in polite society.    The evolution which has taken place along this line

can not properly be ignored by the courts; for carriers of passengers are to be encouraged, rather than disheartened, when they manifest a disposition to improve conditions which have become almost intolerable.    To furnish adequate and comfortable accommodations to the traveling public is an exacting and serious business, not mere vain and expensive trifling.    A prospective traveler who purchases a railroad ticket with a view to going on a journey does not thereby acquire a right to demand of the carrier that he be allowed to enter its waiting-room eight hours or so before the train he expects to take is due, and there go to sleep as a matter of course. To miss his train will not change his status from a waiting passenger into a guest entitled to demand a place wherein to sleep until the next train bound for his destination arrives, or transform the carrier into an inn-keeper òr proprietor of a lodging-house.    Indeed, he would stand upon no better footing than would a patron of a public eating-house, who, after missing his supper through his own tardiness, might, simply because he was the holder of a meal ticket, unreasonably claim the privilege of occupying a chair at table in the room where meals were served, and there passing his time in sleep until the arrival of the breakfast hour.    Accordingly, we hold without hesitation that a railway company may with propriety insist that such of its patrons as contemplate taking a morning train shall, if they desire to refresh themselves by slumber during the intervening night, find quarters other than its waiting-rooms.

3.  According to the version given by the plaintiff himself touching what occurred prior to the time he was assaulted by the station agent, a finding against the defendant company was wholly unauthorized.    Notwithstanding the plaintiff was expressly notified of the above-mentioned regulations of the company governing its waiting-room, he manifested a persistent determination to pay no regard to the same, and displayed a disposition to irritate and move to anger the official whose duty it was to enforce them.    After being twice told by that official that passengers were not permitted to sleep in the waiting-room, the plaintiff confesses he waited until the official again left the room, and then " slipped back on the seat," where he could lay his head on the back of it, closed his eyes, and dropped off into slumber.    While he says he " did not lay down that time," it is evident that he knew the official would protest, if present, against his thus assuming an undignified and sprawling atti-

tude which enabled him to use the back of the seat as a pillow and resume his nap at the point where it had been interrupted.    He did not undertake to assume this position until the officer again left the room, nor in good faith try to observe the rule against using the benches for a purpose other than that for which they were provided.    From the beginning to the end of his altercation with this official, the plaintiff spoke and acted in a manner well calculated to bring down upon himself the harsh treatment he finally suffered at the hands of the company's agent.    Should it in good conscience be held responsible therefor?    The reply to this inquiry is to be found in the report of the case in *Peavy* v. *Georgia R. Co.*, 81 *Ga.* 485, wherein it was pertinently remarked that "It is unjust to a master wrongfully to unfit his servant for exercising the care and prudence which are essential in guarding the master's interest and performing the servant's duty."    The doctrine laid down in that case was subsequently recognized and applied in *City Electric Ry. Co.* v. *Shropshire*, 101 *Ga.* 33, and in the cases cited on page 35.    In *Georgia R. Co.* v. *Hopkins*, 108 *Ga.* 324, the plaintiff sought to recover damages because of an assault which the company's night watchman committed upon him while he was at the station waiting for a train; but it appearing that the plaintiff had himself been guilty of grossly improper conduct, and had exasperated the company's agent by the use of offensive and insulting language to and of him, this court held the company was not liable for the consequences of such assault, even though the agent may not have been fully excusable, and the battery inflicted was entirely disproportioned to the insult given.    In the present case no physical injury was inflicted upon the plaintiff.    His feelings were hurt; that is all.    His sole grievance is that the company's official used unnecessary force in undertaking to discharge his duties.    By persistent disregard of the company's regulations, it is clear that the plaintiff forfeited his right to longer remain in its waiting-room, and might very properly have been ejected therefrom.    Being himself in the wrong, he is not in a position to justly complain that, instead of being forcibly ejected from the room, he was wrongfully treated with unnecessary harshness by the official in charge and then permitted to remain therein, since the plaintiff by his own misconduct so exasperated that official as to unfit him for performing in an irreproachable and conservative manner the duties assigned to him

by his master.    This being the view we take of the case, we shall not specifically deal with other points made in the motion for a new trial, touching the propriety of charging the jury as to the law with regard to the recovery of punitive damages, etc.    In our opinion, the plaintiff was entitled to no damages at all.

*Judgment reversed.    By five Justices.*