DOHERTY, APPELLANT, v. NORTHERN PACIFIC RAIL-
WAY CO., RESPONDENT.

(No. 2,970.)

- (Submitted April 22, 1911.   Decided May 1, 1911.)'

[115 Pac. 401.]

*Railroads—Carrier and Passenger—Regulations—Reasonable-
ness—Duty of Passenger.*

Carrier and Passenger—Regulations—Observance by Passenger.
    1.   The right of the purchaser of a first-class railroad ticket to proceed
on his journey to his destination after he has entered a car in a train
apparently ready to receive passengers is dependent upon his observance
of all reasonable rules adopted by the carrier for the government of
travel upon the character of train upon which he assumes to take pas-
sage.

Same—Rights of Carrier.
    2.   When the demands of business require it, a railroad company may
run trains composed exclusively of sleeping-cars and exclude or remove
therefrom all persons who have not provided themselves with berths or
seats, under reasonable regulations, if the company has at the same
time made provision to accommodate the public by running other trains
at reasonable intervals.

Same—Regulations—Duty of Passenger.
    3.   The obligation rests upon one proposing to become a passenger
upon a railroad train to inquire, when he purchases his ticket, as to
the mode of travel provided and conduct himself accordingly; it is not
incumbent upon the carrier to bring home to the passenger notice of its
rules and regulations in that respect.

Same—Rules—Reasonableness—Question of Law.
    4.   Where the facts are not in dispute, the question of the reasonable-
ness of a rule relative to the carriage of passengers sought to be en-
forced by a railroad company is one of law, exclusively for the court.

Same—Sleeping-cars—Rules—Reasonableness.
    5.   *Held,* that a rule that seat tickets, or half berths, on Pullman sleep-
ing-cars, should not be sold to passengers boarding the train after a
certain hour at night and before 7 o'clock in the morning was not un-
reasonable and arbitrary.

Same—Ejection of Passenger—When not Unlawful.
    6.   Plaintiff purchased a first-class railway ticket, and at 6 o'clock
A. M. boarded defendant's train, composed entirely of Pullman sleep-
ing-cars.   The conductor, relying upon the rule set forth in paragraph
5, *supra,* demanded berth rate fare.   Plaintiff, though willing to pay
for half a berth, the price of a seat, refused to pay that asked and
was put off the train at the next station.   He brought suit and relied
for recovery upon the unreasonableness of the rule.   *Held,* that the dis-
trict court properly directed a verdict in favor of defendant.

`Appeal from District Court, Silver Bow County; John B.
McClernan, Judge.`

ACTION by E. J. Doherty against the Northern Pacific Railway Company. Judgment for defendant, and plaintiff appeals. Affirmed.

*Messrs. Maury & Templeman,* and *Mr. J. O. Davies,* for Appellant, submitted a brief. *Mr. Davies* argued the cause orally.

It is alleged in the complaint, admitted in the answer, proven by the plaintiff, and undisputed by the defendant, that the plaintiff, on the twenty-sixth day of July, 1909, purchased from the defendant a first-class railroad ticket from Butte to Missoula, with the intention of being transported from Butte to Missoula on train No. 15, the train from which he was ejected before reaching Missoula, and while at Warm Springs. Therefore, the relation of carrier and passenger existed between the plaintiff and the defendant prior to and at the time of the ejection. (4 Elliott on Railroads, sec. 1579.) The presumption then arises, and the law is, that plaintiff was then entitled to a seat in and to be carried on said train, from Butte to Missoula, without further charge. (Rev. Codes, secs. 5300–5303, 5347.) Under the above statement of law and facts, the plaintiff at the trial of this cause made out a *prima facie* case which entitled him to a judgment both as a matter of law and fact, and the burden then shifted upon the defendant to allege and prove facts showing that the ejection was lawful. (*Holt* v. *Hannibal S. T. J. Ry. Co.,* 174 Mo. 524, 74 S. W. 631; *Snellbaker* v. *Paducah T. & A. R. Co.,* 94 Ky. 597, 23 S. W. 509; *Daniels* v. *Florida Cent. & P. R. Co.,* 62 S. C. 1, 39 S. E. 762; *Central of Georgia Ry.* v. *Cannon,* 106 Ga. 828, 32 S. E. 874; 6 Thompson on Negligence, sec. 7707.) Appellant also insists that, under the above conditions, it was necessary for the respondent, before a judgment could be given in respondent's behalf, to allege and prove facts sufficient to support a judgment in its favor. (*Alywin* v. *Morley,* 41 Mont. 191, 108 Pac. 778.)

The question here presented for consideration is: Was it not the duty of the defendant and its servants, under the rules and

regulations introduced in evidence, to sell the plaintiff a seat in its train, and to accept from him the sum of seventy-five cents in payment thereof? After a diligent search we have been unable to find any authorities upon the question here involved. However, we insist that the ruling of the court in holding that as a matter of law it was not a reasonable hour in the morning to sell seat tickets, at 6:05 in the morning, under the circumstances disclosed in this case, is so clearly erroneous that it does not merit serious consideration. In Montana, daytime is the period of time between sunrise and sunset. (Rev. Codes, sec. 2032.) "Morning" has been judicially held to be from sunrise until 12 o'clock. (*Texas Mexican Ry. Co.* v. *Douglass,* 69 Tex. 694, 7 S. W. 77.)

*Mr. Wm. Wallace, Jr., Mr. John G. Brown,* and *Mr. R. F. Gaines* submitted a brief in behalf of Respondent. *Mr. Wallace* argued the cause orally.

"The purchase of a ticket entitling a passenger to carriage does not, at least where the railroad has provided ordinary and reasonable facilities for its passengers, entitle the passenger to travel in a sleeping-car without paying additional compensation, although such passenger may not have notice of the rules of the company." (Elliott on Railroads, sec. 1626.) The right to exact fare, whether Pullman, or ordinary train fare, rests on the same foundation. It is not a right to be enjoyed only by promulgation of regulations under section 5348, Revised Codes. Were that so, a regulation would be necessary before fare could be lawfully collected. That it is not is made clear, also, by the contrast found in the phrase "refuse to pay his fare or conform to any lawful regulation," found in section 5350. And, therefore, the matter of whether berth or seat fare shall be charged at 6:15 A. M. for Pullman accommodations is one that concerns the railway and Pullman companies alone —its reasonableness or unreasonableness being for them to decide. But if it were within the purview of section 5350, that section does not say that the regulations shall be either "posted

or published." It does say that the regulations must be "lawful, public, uniform in their application and reasonable." Both this section and the fare sections above quoted have been construed by the supreme court of California, in the case of *Ames* v. *Railway Co.,* 141 Cal. 728, 99 Am. St. Rep. 98, 75 Pac. 311; and it is there held that section 5350 does not demand either posting or publishing. Where the nature of a given regulation is undisputed, its reasonableness is held to be for the court and not the jury. (1 Elliott on Railroads, sec. 202, note; *Railway* v. *Motes,* 117 Ga. 923, 97 Am. St. Rep. 223, 43 S. E. 990, 62 L. R. A. 507; *Gregory* v. *Railway,* 100 Iowa, 345, 69 N. W. 532; *Montgomery* v. *Railway,* 165 N. Y. 139, 58 N. E. 770; *St. Louis Ry.* v. *Hardy,* 50 Ark. 134, 17 S. W. 711.) This must be so as otherwise one jury would declare a given regulation reasonable, while another would declare it not.

The evidence discloses that the Pullman rule prohibits seat sales after 10 P. M., and until a "reasonable time in the morning." By its terms this rule was subject to two exceptions: (1) "Special orders as to particular lines," and (2) "The rules of the road over which the cars are running." And the evidence showed a rule, by custom of operation on the Northern Pacific, fixing the morning hour—otherwise left indefinite by the rule—at 7 A. M. If this be a regulation, it was "lawful," because it violated no law. The seat furnishing statute, section 5347, was met, under the interpretation of the supreme court of California, by the second section of No. 15, and also by the fact that he was offered a berth, giving double accommodation. To hold that section 5347 meant a seat in a Pullman without other charge than regular train fare, would force the railways to give day coach accommodations only on all trains, and would destroy the Pullman car business altogether. It was "public" in that it was constantly and unvaryingly applied in the daily operation of the business; and it was "uniform in its application" because it was so applied to all alike, as well as "reasonable." (Rev. Codes, sec. 5348.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Plaintiff brought this action to recover damages for a wrongful expulsion from one of defendant's trains. The complaint alleges that on July 26, 1909, the plaintiff purchased from the defendant at Butte, Montana, a ticket from that place to Missoula, Montana; that he entered one of defendant's passenger trains, delivered the ticket to the conductor in charge, and was riding as a passenger on his way to Missoula; and that, before he reached his destination, the defendant, acting through its conductor, at Warm Springs station, without right and with force and violence and against plaintiff's will, with circumstances of indignity and by kicking or striking plaintiff with his knee, ejected him from the train, to his damage, *etc.* The answer admits the purchase of the ticket by plaintiff; that he entered upon the train as alleged; that he offered the ticket to the conductor; and that he was ejected from the train at Warm Springs, and denies all the other allegations of the complaint. It then alleges affirmatively that the expulsion of plaintiff was due to his own fault; that he entered a train consisting wholly of Pullman cars; that in order to ride thereon, in addition to the purchase of a regular first-class ticket, it was necessary to pay Pullman car fare; that, upon being advised by the conductor that his ticket could not be accepted unless he paid the Pullman fare, he refused to pay it, and that because of such refusal the defendant was forced to stop its train and expel him therefrom. Upon these allegations there was issue by reply. At the trial, the hearing of the evidence being completed, the court sustained defendant's motion for a verdict in its favor. The appeal is from the judgment entered thereon.

The grounds of defendant's motion are: that the complaint fails in several particulars to state a cause of action, and that the evidence is insufficient to make a case for the jury. For the purposes of this decision, we shall assume that the complaint states a cause of action, and consider only the question whether the action of the court in directing a verdict was cor-

rect.  Plaintiff does not now claim that upon his expulsion from the train he was subjected to maltreatment of any kind.  His contention is that the wrong done him was the violation by the defendant of his right to continue his passage after it was begun by requiring him to leave the train.  We shall also therefore eliminate consideration of the evidence showing the manner of plaintiff's expulsion, and examine that only upon which he bases his contention that the court erred in directing a verdict for the defendant.  The evidence shows the following:

On July 26, 1909, the plaintiff and others purchased from defendant at Butte first-class tickets from that place to Missoula intending to take defendant's train known as No. 15.  This train was divided into two sections.  The first was made up exclusively of Pullman sleeping-cars.  The day coaches were in the second section.  The two sections were scheduled as one train.  The first section arrived at Butte about 6 o'clock, some two hours and a half after daylight, and left a few minutes later.  The second section usually followed after an interval of twenty-five minutes.  On this morning it followed thirty or forty minutes later.  When the first section arrived, the plaintiff, with six or seven others bound to the same destination, sought to enter it.  A porter employed on the train, standing at the entrance of the car, told them that there was room for five more passengers only, and would not permit more than five to enter, though others attempted to do so.  Among the five was plaintiff.  The other four were strangers to him, and it seems had not met each other before that morning.  When the conductor came to collect their Pullman fares, the following took place:

Plaintiff testified: "The Pullman car conductor came along and says: 'Do you gentlemen want this drawing-room?'  And one of the gentlemen spoke up and says: 'How much is it?'  He says: 'Six dollars.'  He says, 'Haven't you got some other place to sit besides here?  That's pretty steep.'  He says: 'I can give you berths.  A dollar and a half for two.'  He says: 'That will be six bits apiece?'  He says: 'Yes.'  He went away and after awhile he came back, and says: 'If you want berths, dig

up.' They started to give him six bits apiece. He took it and came to me, and he wanted a dollar and a half from me. I says: 'What do you want a dollar and a half from me for?' He says: 'Because you haven't got anybody with you.' I says: 'I will pay six bits, like the other gentlemen, but I won't pay a dollar and a half.' He says: 'You will pay a dollar and a half or get off.' I says: 'You took six bits from four different men in front of me, and you want me to pay as much as two of them.' He says: 'Well, you'll get off at the next station.' So the conductor came along and took up the tickets, and he told the conductor: 'This fellow won't pay for a berth.' So the conductor took and punched my ticket and marked it, with an indelible pencil, 'R25' or '26,' I don't know which. So, when we got along toward Warm Springs, he flagged the train. There were three of us sitting in a seat together. I was the last one of the three. The conductor asked me if I would pay a dollar and a half. I said: 'No; but I will pay six bits.' So he reached over and grabbed hold of me, and dragged me out of the seat, and started me ahead of him along through the aisle, or whatever you call it, and pushed me out onto the platform, and they had the vestibule open. I placed my hands against the side of the car, like that [illustrating], and he started pushing me down, and he pushed me off anyway, and I won't say whether he kicked me with his foot or gave me a punch with his knee, but he got me in the ribs, anyway, and put me off the train. It was a good stiff jolt in the ribs. When I speak of 'six bits,' that is the ordinary commonplace expression for seventy-five cents. * * * The Pullman conductor first asked if our party, consisting of we men in there, wanted the drawing-room; and he was then asked by some one of the party how much it was, and stated, 'Six dollars.' Then he was told that that seemed rather high, and couldn't he give them some other accommodation. The train pulled out of here about five minutes after 6 or at 6 o'clock in the morning—close to 6, probably a little after. The curtains were down on some of the berths, but there was two or three seats probably in the center of the car that was open. Then the conductor said he

could sell a berth for a dollar and a half for two. He said: 'Six bits apiece.' As to whether he said that or some of the men said that would be six bits apiece, they asked him if that would be six bits apiece, and he said, 'Yes.' His statement was that he could sell a berth for a dollar and a half. * * * He never said no such thing as that the party could pair off as they wanted to. He didn't say that. I apparently was the last person to collect from. The others paid six bits apiece. He collected six bits apiece from four men. He then had pay for two berths. Then he told me that I would have to pay a dollar and a half. He told me that was the price of the berths. I insisted that I should be carried for the price that each of the other men had paid. That was the controversy between us. I said I would pay six bits, just the same as the others, and he told me that I would have to pay the price of a berth. He didn't go and get the train conductor then. The train conductor come along. He never left there. The train conductor arrived. Down to that time, I had had my train ticket—my passage ticket. I gave the passage ticket to the train conductor —offered it to him. The Pullman car conductor said: 'This fellow won't pay a dollar and a half for a berth.' The train conductor asked him if he wanted me put off. He said: 'Yes,' if I didn't pay a dollar and a half. I told the train conductor I would only pay seventy-five cents, what each of the other men had paid. That was the actual difference between us. * * * I just sat there, and he reached over and pulled me out. When he said, 'Come on, get out of here,' I sat there. I didn't intend to go voluntarily. I sat there after he told me to, 'Come, get off,' until he took two steps to put me off; and I meant to 'put it up to him' to put me off the train, if I was to be put off. That was my purpose. I stepped down on the steps of the platform when he pushed me. When I got out on the car platform, he asked the Pullman car conductor that was down below, 'Do you want this man put off?' The Pullman car conductor was standing on the ground, and the railroad conductor says, 'Do you want this man put off?' He says, 'Yes; unless he pays a dollar and a half.' I says: 'I won't pay a

dollar and a half. I will pay six bits like the others.' We were right on the platform. I was maintaining my position, and they were maintaining theirs. The question was whether I should pay seventy-five cents or a dollar and a half. That was the point in dispute." Plaintiff stated in other portions of his testimony that he knew that he was in a Pullman car and had ridden in such a car often.

Hoyt, the train conductor, called by defendant, testified: "I am familiar as train conductor with the rule of business as it was carried on as to when they exact seat fare and when they exact berth fare. After 7 o'clock in the morning it is seat fare. Anything before that it is berth rate. The berth rate is $1.50 between Butte and Missoula. When I got into this drawing-room, I learned who it was that wouldn't pay the fare by the Pullman conductor showing him to me. I explained to him in regard to the way the fares was collected, and what we would have to do if he wouldn't pay it. I would mark his ticket off at Warm Springs, and he could get the second section with day coaches, which would make a difference of about forty minutes to Missoula. It was between thirty and forty minutes behind us, and I told him that. This took place after we were out of Butte about fifteen minutes. * * * I told him before 7 o'clock in the morning it was berth rate; and, if there were two men together, the two could stay in the berth and pay the fare between them; but where there was only one, he had to pay full fare. He said he would pay but seventy-five cents; that is, what the rest of them paid. He said he had a first-class ticket, and he was going to ride on it. I told him he couldn't ride on a first-class ticket without Pullman transportation. I told him I would mark his ticket, and I did. After so marking the ticket, I canceled it once and handed it back to him, and he accepted it. The train at this time was just coming into Warm Springs."

The witness Baysoar, agent of the defendant at Butte, testified: "I was familiar with the method of selling seats and berths in Pullman cars as they prevailed in the regular course of business in July of last year. They ceased selling tickets at night to any point reached by the train after 10 o'clock P. M. In the

regular course of business, the sale of seats in Pullman cars would be resumed at 7 o'clock in the morning of the next day. In that interval between 10 P. M. and 7 A. M., there is nothing in the way of accommodations in Pullmans but berths on sale, aside from the drawing-room. We never in the course of business sell half berths. We couldn't do that. Two adults could occupy a berth when a berth was purchased. That is the limit for adults.'' As an exhibit to his testimony there was introduced a rule relating to the Pullman car service, which he stated was the only rule of the defendant and the Pullman company upon the subject. The portion of this rule which is material here is the following: ''Ticket agents and conductors must conform strictly to tariff in the sale of accommodations and to the instructions contained herein. (a) Seats in sleeping cars will be sold from stations passed after a reasonable hour in the morning, where such sales will not discommode berth passengers; but will not be sold to stations passed after 10:30 P. M., or before a reasonable time in the morning, except by special orders as to particular lines, or where a car is due to arrive at terminus by midnight. This rule will not apply to observation, composite, library or club cars, in which seats may be sold during the night, when such sales do not interfere with the sleep of a passenger or conflict with the rules of the road over which the cars are running. Seat passengers will not be located in space of berth passengers.'' It appears, further, that the train conductor by virtue of his general power of control over the train had authority to eject passengers from Pullman cars when they refused to pay their fare or refused to comply in other respects with the rules governing the use of them by passengers, though it does not appear definitely whether the defendant was running the Pullman cars on its own account, or was running them by some traffic agreement with the Pullman company. In any event, it is not questioned that in ejecting plaintiff he was acting within the scope of his employment as the servant of the defendant.

It may be conceded, as counsel for plaintiff contend, that, having purchased a first-class ticket and entered a car apparently [1] ready to receive passengers, plaintiff thereby became a

passenger and was thereafter entitled to all the rights and privileges appertaining to his relation to defendant as such, among which was his right to proceed on his journey to his destination (Elliott on Railroads, sec. 1579) ; but to this concession must be attached the reservation that the continuance of his right was conditional upon his observance of all reasonable rules adopted by the defendant to govern travel upon the character of train upon which he had assumed to take passage. "A common carrier is entitled to a reasonable compensation, and no more, which he may require to be paid in advance. If payment thereof is refused, he may refuse to carry." (Rev. Codes, sec. 5337.) "A common carrier may demand the fare of passengers either at starting or at any subsequent time." (Section 5349.) Again: "A common carrier of persons may make rules for the conduct of his business, and may require passengers to conform to them, if they are lawful, public, uniform in their application, and reasonable." (Section 5348.) So, too, where a railroad company has provided ordinary and reasonable facilities for its passengers, the purchase of a ticket entitling a passenger to carriage over the railroad does not entitle him to travel in a sleeping-car without paying additional compensation, even though he may not have notice of the rules of the company. (4 Elliott on Railroads, sec. 1626.) In such case the company is within its rights when it removes the passenger to a car in which are provided the accommodations for which he has paid, if it is done without unnecessary force. It seems apparent, also, that, when the demands of business require it, a railroad company may run [2] trains composed exclusively of Pullman sleepers, and exclude or remove therefrom all persons who have not provided themselves with berths or seats, as the case may be, under reasonable regulations, if it has at the same time made provision to accommodate the public by other trains running at reasonable [3] intervals. In such case, it is not incumbent upon the company to bring home to the passenger notice of its rules. The obligation rests upon the person proposing to become a passenger to inform himself when he purchases his ticket as to the mode of travel provided and to conduct himself accordingly. (*Ames*

v. *Southern Pac. Ry. Co.,* 141 Cal. 728, 99 Am. St. Rep. 98, 75 Pac. 310.)   By inquiry the plaintiff in this case would have ascertained that a train fully equipped with day coaches was due in a few minutes.   Indeed, we are justified by the evidence in assuming that he was informed that the train he entered was composed of sleeping-cars, and he must be presumed to have known that an additional fare would be exacted; for he stated that he knew that he was in a Pullman, and had often traveled in such cars.   That an additional fare will be exacted in such cases· is a matter of common everyday experience and observation.

The integrity of the judgment in this case, therefore, is to be determined by answer to the inquiry: Was the rule in question a reasonable one?   The statements of the different witnesses agree in all essential particulars.   The facts are not disputed. [4]   Therefore, the question of the reasonableness of the rule was exclusively one for the court.   (1 Elliott on Railroads, sec. 202, and cases cited; *Central of Georgia Ry. Co.* v. *Motes,* 117 Ga. 923, 97 Am. St. Rep. 223, 43 S. E. 990, 62 L. R. A. 507.) The purpose of the rule is apparent.   Pullman sleeping-cars in ordinary use are intended to, and do, answer two purposes, *viz.,* to furnish to passengers who desire and are willing to pay for them berths for sleeping purposes at night and for superior comfort and convenience and liberty of movement during the day, and to afford to day passengers the same convenience and comforts which are extended to berth owners during the day.   The second purpose is subordinate to the first, since it is incumbent upon the railroad company to require both its employees and passengers to observe such rules and regulations as will permit the owners of berths to enjoy both their day and night privileges.   It is imperative that they shall not be unreasonably crowded during the day, and that beyond a reasonable hour in the evening, and a reasonable hour in the morning, they shall not be disturbed by the noises incident to the coming and going of seat passengers.   It is entirely in accord with common experience and observation that the usual hour for retirement to

rest in the evening is not far from that fixed in the rule, after which seats may not be sold, and that the period of eight and one-half hours, the time set apart for that purpose, is not beyond what is reasonably necessary for the physical health and well-being of the average man. Besides this, such privacy as may be had in the absence of day passengers for preparation to retire and for the morning toilet, is, in the opinion of the average person, indispensably necessary. In view of these considerations, [5] we do not think the rule unreasonable and arbitrary, even though in the month of July in this latitude daylight comes two and one-half hours earlier than 7 o'clock in the morning, and even though the plaintiff and his associates did not wish to go to bed. It is not unreasonable that persons situated as were the plaintiff and his companions, though permitted to enter the car, should be subject to the rules incident to night travel, and pay the price fixed for the accommodation during the hours set apart for that purpose. To hold otherwise would require railroad companies to lengthen or shorten these hours according to the accidents of the seasons, or to vary them at the whim of individual passengers.

Under the rule as interpreted by the Pullman conductor, half berths could not be sold, but one berth could be sold to two persons. His sale of berths to the four other passengers as he did, allowing each to pay one-half the price, was a compliance with the rule as he interpreted it. It was a question between him and his employer whether he correctly interpreted it. He was clearly within its reasonable requirements in demanding the berth rate from the plaintiff; and the plaintiff had no right to complain that he was not so situated that he could join with some one else in the purchase of his accommodations and obtain them at the same price as the others. But counsel say that defendant is chargeable with putting him in that position, because it is apparent that, if there were accommodations for five persons, there were for six, and but for the action of the porter in charge in excluding other passengers he would have obtained his accommodations at the same price as the others

Under the cause of action alleged in the complaint, however, we do not think the plaintiff is entitled to recover because of the mistake made by the porter. The conductor in collecting the fares obeyed the rule as he was allowed to interpret it. He would not have been justified in modifying the rule in order to accommodate plaintiff. Nor do we think that a porter whose duties ordinarily are those of a domestic servant had the authority to modify it for him. There is nothing in the record tending to show that he had such authority, nor, in so far as we may assume knowledge as to the character of his duties, may we infer that he had such authority. In his controversy with the conductor, the plaintiff did not rely upon the information given him by the porter. He did not claim that the porter misinformed him. His claim was that the rule was unreasonable.

The judgment is affirmed.

*Affirmed.*

MR. JUSTICE HOLLOWAY concurs.

MR. JUSTICE SMITH: The plaintiff claims that technically he has a cause of action against the Northern Pacific Railway Company, and the latter has interposed a purely technical defense. It invokes a rule of the Pullman company to the effect that no seat tickets shall be sold before a reasonable hour in the morning, and its employees have testified that such reasonable hour has been fixed at 7 o'clock—by whom it does not appear. Plaintiff and six other persons, all apparently strangers to each other, desiring to ride from Butte to Missoula, boarded a solid Pullman train at about five minutes after 6 o'clock on a bright morning in midsummer. He knew that he was boarding a Pullman car, and that he would be obliged to pay extra for the privilege of riding thereon. The porter at the step of the car allowed him and four other men to get aboard, turning others away, because, as he said, he had room for but five. What reason is there for supposing that the porter was not acting within the scope of his duty and authority when he allowed five men to board the car? If he had room for five, he certainly had room for six. That there was ample seat room for six is not disputed.

Assuming, for a moment, that the rule is a reasonable one (on paper), it is a familiar principle of law that it should be applied and interpreted in the light of all the surrounding facts and circumstances. In this case, a most important fact is that the Pullman company, through its servants, created the peculiar situation in which the plaintiff found himself. The majority opinion quotes the testimony at length. Can any reasonable man suppose for a moment that any of the five passengers desired to go to bed or to purchase a half berth? Certainly not. No, such claim is made. Each wanted a seat, and that is exactly what the first four got. It is a mere subterfuge to pretend that these strangers were buying berths to be occupied, as such, for about three-quarters of an hour. Had the plaintiff complied with the rule and paid $1.50 there would have been an empty seat beside him which the Pullman company had received payment for, but which could not be occupied. The Constitution and statute laws of this state expressly prohibit discrimination under such circumstances as are disclosed by this record. Can it be said that the sleeping-car company received the plaintiff upon an equal footing with those who accompanied him into the car? But it is claimed that the rule is accountable for the result. Are rules promulgated for the embarrassment and annoyance of the traveling public? Are they so fixed and inflexible as to be sacred and unchangeable? Can discrimination be indirectly practiced by virtue of them? Can the Pullman company, in effect, violate the very spirit of its own rule and escape liability on the ground that there has been a technical compliance with the terms thereof? I think not. The argument that the Pullman car conductor correctly interpreted the rule because he would have been discharged had he placed any other construction upon it, does not appeal to me as having any force. Let us look at this situation from a standpoint of common sense. Let us suppose that, instead of invoking the fiction that the first two passengers desired to occupy a berth together and the second couple likewise, the Pullman car conductor had said to them: "Gentlemen, I see you desire seats, but I cannot sell a seat, as such, until 7 o'clock. However, there is plenty of room here, so sit down, and at 7

o'clock I will collect a seat fare of seventy-five cents from each of you." Would the rights of this public service corporation, the Pullman company, have been violated? Would it have lost any money which rightfully belonged to it? Or let us suppose he had said to Doherty: "In your case, as you are an odd man here, I cannot carry out the counterfeit notion that you desire to go to bed at this time in the morning, having slept all night; so, therefore, desiring to accommodate you as one of our patrons and one of the great traveling public, I invite you to occupy one of these empty seats for three-quarters of an hour, at the expiration of which time I will call upon you to pay me the sum of seventy-five cents, the same amount paid by those who boarded the car with you." Would any money have been lost to the Pullman company by such a course of conduct? Rather, would such courteous, polite and novel treatment not have been calculated to induce the public to travel in its cars whenever possible, and thus enhance its revenues? Perhaps the conductor would have been glad to extend such a courtesy, but the answer is that he would have been discharged had he done so. I recognize no rule as reasonable which can be so manipulated as to embarrass the traveling public under circumstances where the exercise of a little common sense, and regard for the comfort and welfare of others, would make it possible to accommodate them and avoid causing them humiliation.

But this plaintiff is entitled to very little sympathy. He may have a technical cause of action against the Northern Pacific Railway Company for purely nominal damages. He said on the witness-stand: "I meant to 'put it up to him' to put me off the train if I was to be put off. That was my purpose." When he found himself confronted with a rule of the Pullman company which the conductor had no authority to change or modify, or even to construe reasonably, without jeopardizing his position, or, as he himself said, "losing his job," he might have paid the extra seventy-five cents under protest and recovered it later, if wrongfully paid. Or he could have left the train quietly at Warm Springs, taking the second section forty minutes later, without substantial loss. He did in fact ride to Missoula, on

the second section, using his original railroad ticket for that purpose. In the affairs of life these little misunderstandings and annoyances are bound to occur. They ought not to be magnified into lawsuits unless some substantial injury has been suffered. It is unfair to the taxpayer that his money should be frittered away in the maintenance of courts for the purpose of hearing such controversies. While the Northern Pacific Railway Company, like every other corporation and individual, should be compelled to make full compensation for all injuries occasioned through its negligence, it ought not to be annoyed and harassed with lawsuits which have no substantial merit solely on account of the fact that it is a corporation. For the reasons herein stated, I do not dissent from the disposition of the case.